# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **JERALD SEALS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **1:15-CV-1976-VEH** |
| **LEE BRASS FOUNDRY LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a civil action filed by the Plaintiff, Jerald Seals, against the Defendant,

Lee Brass Foundry, LLC. ("Lee Brass"), his former employer. The Complaint alleges

that the Defendant "harassed [the] Plaintiff, treated [the] Plaintiff differently[,] and

terminated [the] Plaintiff," in violation of the Americans with Disabilities Act (the

"ADA"), as amended by the ADA Amendments Act of 2008 (the "ADAAA"), 42

U.S.C. §§ 12101-12213, and 47 U.S.C. §§ 225 and 611.[1] (Count One). The Complaint

also alleges that the Defendant "subjected [him] to different terms and conditions of

employment because of his race, subjected [him] to racial discrimination and

terminated [him] because of his race, African American," in violation of the Civil

---

[1] Titles I, II, III, and V of the original law are codified in Title 42, chapter 126, of the
United States Code beginning at section 12101. Title IV of the original law is codified in Title
47, chapter 5, of the United States Code.

Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981). (Count Two).

The case comes before the Court on the Defendant's motion for summary judgment. (Doc. 26). For the reasons stated herein, the motion will be **GRANTED in part** and **DENIED in part**.

## I.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must

designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce

"significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.    FACTS[2]

### A.    Lee Brass's Business and Organization

Lee Brass is a manufacturing facility that produces metal castings or parts for its customers based on specifications provided by the customer. There are multiple steps in the manufacturing process: the Foundry; the Cleaning Room; Test and Pack Department; and Shipping Department. A part is first cast in the Foundry. Thereafter, excess metal is cut off of the part by the saw operators. Afterwards, it is sent to the Cleaning Room in order to be smoothed down, and excess metal removed, before it is sent to the machine shop. The number of parts passing through each phase of Lee Brass's manufacturing process is dictated by the number of customer orders received.

### B.    Lee Brass's Human Resources Department and Policies

Lee Brass's Human Resources Department ("HR") is run by Jerome Truss. As

---

[2] The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included herein exactly as it was proffered, without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

stated in its employee handbook, Lee Brass has a policy of prohibiting workplace discrimination and harassment based on race and provides employees with multiple options to report concerns of alleged race discrimination. (Doc. 28-2 at 3, ¶6; doc. 28-2 at 14, ¶I and pp. 60-62). The Plaintiff disputes that these policies were effective in this case. (Doc. 34 at 3, ¶8). However, he admits that he received the Employee Handbook.

The handbook provides that "[e]mployment is at the will of Lee Brass, and either Lee Brass or the associate may at any time terminate the employment relationship with or without cause." (Doc. 28-2 at 10; *see also* doc. 28-2 at 13). It states that "violation of any of the following rules will lead to disciplinary action that may include dismissal[:] . . . Fighting or acts of physical violence on company property[;] Immoral, illegal or disorderly conduct[;] . . . [and] Insubordination[.]" (Doc. 28-2 at 59). The handbook also sets out the following "Disciplinary Procedures:"

Disciplinary Procedures

The purpose of this policy is not primarily to punish, but to correctively encourage behavior modification to discourage repetition of misbehavior by the offender or by another following their example. Record of disciplinary action will become part of a associate's personnel file.

Before administering discipline, the manager should be sure they have

all the facts. The associate's past record should be examined in the Human Resources office to determine if the associate has had any previous violations. Associates should be given ample opportunity to present their side before any final decision is made as to the discipline to be administered. The review and decision to issue disciplinary action is to be done in a timely manner.

> – A verbal counseling should represent a direct attempt of the manager and associate to deal with a breach of rules at an early stage. It should clarify, in specific terms, what behavior needs attention and define a method and a reasonable time for correction.

> – Written warnings represent a more formalized means of correcting behavior and become part of an associate's work record. Should associates have any additional factors or knowledge of extenuation circumstances relating to the incident they should be discussed at this time. The supervisor or department manager will then consider this information when deciding what discipline to administer. In order to maintain consistency, Human Resources must be involved in the preparation of any written warnings. Human Resources will insure that documentation of the event leading to any action is made a part of the offending associate's record.

All disciplinary actions will be cumulative for a rolling period of 6 (six) months. Group violations are cumulative.

The usual disciplinary steps will be:

| | |
|---|---|
| Informal Step | Verbal Counseling |
| First Step | Written Warning |
| Second Step | Final Written Warning |
| Third Step | Subject to Discharge |

Depending upon the violation, the procedure may be at any of the above steps and other required condition/actions may have to be met.

(Doc. 28-2 at 59-60).

### C.    The Plaintiff's Employment with Lee Brass

In January of 2012, Seals began his employment with Lee Brass as a "laborer" on the cleanup crew, in the Foundry, which is part of the Maintenance Department. The position of laborer is physically demanding, and required Seals, among other things, to shovel clay by carrying shovel loads of approximately 50 pounds on a regular basis.

The Plaintiff testified in his deposition that, after about 90 days in the Cleanup Crew, he "got hired on permanent." (Doc. 28-3 at 10(35)). Seals applied for and was given an open position as a "saw operator" in the Foundry, where his duties were to cut excess metal pieces off of the parts after they are cast from molten metals.

At the time Seals worked at Lee Brass, there were two different types of saws, referred to as the "big saws" and the "small saws." Parts are delivered to the sawing area by one of several forklift operators, who transport the parts on a pallet from the area of the Foundry where the parts are cast. The big saws are used to cut larger parts, and the blades can be moved – rather than the operator simply moving the part, as on the small saws – to cut the part at angles. The blade on a big saw is sixteen inches in diameter. When larger or heavier parts need to be sawed, the saw operators use a crane (also referred to as a winch) next to their saws to lift the part onto the sawing

table. However, Seals testified that the winch did not always work, and when they did not, the big saw operator would "[b]ring [the part] on a forklift or . . . wait until they get around to fix [the winch]." (Doc. 28-3 at 11(40)).

Not everyone who works on a small saw also works on a big saw. (Doc. 28-3 at 12(43)). Seals testified that that was because people "have to be trained to work on the big saw." (Doc. 28-3 at 12(43)). Seals agreed in his deposition that it was hard to work on the big saws and agreed with the characterization of that work as "skilled labor." (Doc. 28-3 at 12(44)). McCormick testified in her deposition that employees did not have to be trained on a small saw but they did have to be trained on a big saw. (Doc. 28-4 at 7(24)-8(25)). She also agreed that safety training on a big saw was conducted prior to employees' using it. (Doc. 28-4 at 8(26)). Derrick Murphy, another employee of the Defendant who has worked there for 29 years, agrees that a big saw required training and that "some guys don't feel comfortable sawing on them big saws." (Doc. 33-3 at 26(98)). He was never trained on a big saw and did not know how to operate one. (Doc. 33-3 at 27(103)). Stan Hand, the plant manager, testified that employees who worked a big saw made the same amount of money as those who worked a small saw. (Doc. 27-8 at 8(27)). The Plaintiff testified that people who work a big saw get paid more. (Doc. 28-3 at 17(63)).

After sawing, the saw operator puts each part into a bin next to his or her saw.

The parts in the bin are then inspected by a supervisor or a more senior saw operator to ensure that they are cut properly, and then they are sent to the cleaning room. (Doc. 28-3 at 16(58-59)). The saw operator throws the scrap metal that he or she saws off the part into another bucket. The scrap bucket contains only a single alloy at a time. That is because the scrap is melted down again to be reused, and different alloys of scrap cannot be intermingled.[3] Accordingly, a saw operator works on only one type of alloy at a time. Each time a saw operator finishes a job, a forklift operator goes to the saw operator's machine and switches out his or her scrap bucket and replaces it with an empty scrap bucket for use by the operator to receive scraps from the next job. It takes approximately 30 minutes to transition a saw operator from cutting one type of alloy to another type of alloy.

The job description of saw operator explains that the operator is required to lift between fifty and seventy-five pounds. However, when Seals became a saw operator, he was assigned to a small saw. His supervisor was Kenny Deramus. Seals explained that he sought out that position because he got a pay increase and because "it was lighter weight," and "less physically demanding." (Doc. 28-3 at 11(37)). He explained further that "the parts was so small on the small saw. It was so small, so, I mean, you

---

[3] Lee Brass manufactures parts out of four kinds of alloy – gold brass, copper nickel, red brass, and green brass.

could stand there and do that all day." (Doc. 28-3 at 11(38)). Throughout his tenure, he was assigned primarily to do work on a small saw cutting green brass and red brass. However, as will be discussed, when Judy McCormick became his supervisor, she began assigning him to work a big saw.

D.    **The Plaintiff's Hospitalization**

In April of 2013, Seals had to leave work in the middle of his shift because he began vomiting blood and was experiencing dizziness, pounding in his ears, and olfactory disturbances. Leslie Underwood, a forklift operator at Lee Brass, recalled the incident in his deposition and stated:

A.     . . . I didn't know what was wrong with him. So I went and got Judy [McCormick], and I told Judy about it. I said, he's spitting up blood and stuff. I don't know what's wrong with him.

Q.     And what did Judy do?

A.     They went to the first aid building.

Q.     Okay. So did Judy see him throwing up blood?

A.     He had it on the paper towel.

Q.     And she saw that?

A.     Yeah.

Q.     And you were there as well?

A.     Yeah.

(Doc. 28-10 at 27(10)).[4] Derrick Murphy, another employee at Lee Brass, also witnessed the Plaintiff vomiting blood.

Seals began experiencing these symptoms around the start of his shift at 3:00 a.m. Around 7:00 a.m., when Deramus got into work, Seals reported to him that he was feeling ill and asked to be dismissed for the day. Deramus agreed without hesitation.

Seals then drove himself to the emergency room at Stringfellow Memorial Hospital. The nurse in the E.R. told Seals he was "dying." The doctors at Stringfellow informed Seals that he was "short on blood" and gave him a blood transfusion. Thereafter, Seals was hospitalized at Stringfellow for approximately eleven days and tests were performed. The testing did not reveal what had caused Seals to become ill, and the Plaintiff has not had a recurrence of these symptoms.[5] When Seals was released from the hospital he was feeling physically well with the exception that he did not have much of an appetite. He was given a doctor's note stating that he could work only "light duty" for a time. Other than this hospitalization, Seals had no medical issues of any kind while he was employed by Lee Brass.

---

[4] McCormick testified that she never saw Seals throw up blood at any time nor heard from any other source that he had done so. (Doc. 28-4 at 44(172)-45(173)).

[5] In his deposition, he describes another incident where he went to the emergency room for an unrelated issue. (Doc. 28-3 at 81(320)).

## E.    Seals's First Attempt To Return to Work

Seals attempted to return to work the day after he was released from the hospital. He gave his "light duty" doctor's note to either Deramus or Ray Wood, both of whom had supervisory authority over him. One or both of them told him that he could not return to work until he was cleared of all restrictions.[6] No one explained to him why he was not allowed to work light duty. (Doc. 28-3 at 41(157)).[7] Deramus told Seals that, before going home, he should go to HR and speak with Truss, which Seals did. Truss confirmed to Seals that he could not return to work until his doctor cleared him of restrictions. Seals did not encounter McCormick that day.

In his declaration, Truss states that Lee Brass allowed employees to work light or restricted duty only where the medical condition precipitating the need to work light duty was caused by an injury that occurred in the course of the employee's job duties. (Doc. 28-2 at 3, ¶7). He states that Deramus has never allowed light duty otherwise. (Doc. 28-2 at 3, ¶8). In his declaration, Wood denies ever giving light duty to anyone not hurt on the job. (Doc. 28-9 at 2-3, ¶3). In her deposition, McCormick

---

[6] In his deposition, Seals agreed that he never used the word "accommodation" with anyone at Lee Brass. (Doc. 28-3 at 85(335)). When he returned from being hospitalized, he told Lee Brass that "they said put me on light duty until further notice because I've got to go back and have another surgery." (Doc. 28-3 at 32(122)). However, he was told that he could not return to work until he was "cleared from a doctor." (Doc. 28-3 at 32(122)).

[7] Seals testified in his deposition that "light duty" would have meant that he stay on a small saw–the job he had been doing. (Doc. 28-3 at 34(130)).

13

stated that employees only get light duty for "job-related injuries," and she did not know of an incident where anyone got light duty for a non-job-related incident. (Doc. 28-4 at 47(182)).

In his deposition the Plaintiff pointed to Richard Bearden, an employee at Lee Brass, and said that after Bearden hurt his back moving a hot water heater at his home, "[h]e had to be on light duty. He didn't do anything." (Doc. 28-3 at 44(172)-45(173)). Bearden worked on the cleanup crew with Seals prior to Seals transferring to the position of saw operator. Seals claims Bearden asked Seals if he could "cover" for him because of his back injury. Seals encouraged Bearden to report his injury to their supervisor at the time, Ray Wood, which Bearden reported to Seals that he had done. According to Seals, Wood gave Bearden a back brace to wear. The Defendant disputes that Bearden was given light duty.

After being told he could not return to work without a full release, Seals "begg[ed] the doctor to give me a excuse without no restrictions so I can go back to work and won't get evicted out my house." (Doc. 28-3 at 74(289)). Seals testified that the following exchange took place between him and his doctor: "I'm about to be evicted out my house, about to lose my car. He was like, you can't lift nothing heavy. I said, well, my job that I do have, it's on a small saw. I'm not lifting nothing heavy. [The doctor said are you] sure? You sure? I said I'm positive." (Doc. 28-3 at 74(291-

292)).

**F.    The Pill Cap Endoscopy Procedure**

Several days after he was released from the hospital, Seals returned to the hospital and had a "pill cap" endoscopy where he swallowed a small camera which was used to examine his digestive tract.[8] In order for the endoscopy to be successful, Seals was required to be active and walk around while the camera passed through his system over the course of several days. He had a small bag related to the procedure strapped to his side as he walked around.

**G.    Seals Returns to Work**

Three or four days after the start of the pill cap endoscopy, while that procedure was ongoing, and despite the fact that the doctor had not yet given him the results, Seals had already been cleared to return to work by his doctor and brought a note to that effect to the HR department at Lee Brass. On the day he brought in his new doctor's note, Seals ran into McCormick, who at that time was not yet his supervisor[9], outside the HR office. McCormick noticed the equipment that Seals was wearing related to the endoscopy procedure and inquired about it. This was the first conversation Seals had ever had with McCormick. Regarding that conversation, the

---

[8] In addition, Seals also had a colonoscopy at some point. (Doc. 28-3 at 79(310)).

[9] While he missed work, his supervisor was still Deramus.

15

following exchange took place in the Plaintiff's deposition:

> Q.    Okay. And when you were bringing in your paperwork, you said you had a conversation with her, and she said, that's serious.
>
> A.    Yes. She said, I heard that was very serious. I said, yes, ma'am. First she asked me what that was.
>
> * * *
>
> A.    . . . And I told her what [the pouch] was. I said it's monitoring my body taking pictures where they can see what's going on.

(Doc. 28-3 at 49(191-192)). Seals also testified that she said "I'm glad to see you back in good health." (Doc. 28-3 at 36(137)). Seals told McCormick that he had been hospitalized, but did not tell McCormick about the specific symptoms which had put him in the hospital.[10] It is undisputed that Seals never gave McCormick any paperwork or doctor's note indicating that he had been in the hospital or was having medical issues of any kind.

Woods was Seals's supervisor when the Plaintiff returned from the hospital.[11] Seals told Woods that he was not supposed to lift anything heavy. Woods told Seals he would not need to since he worked a small saw. When Seals returned to work after his hospitalization, he continued to be assigned to a small saw, as he had been before

---

[10] Pat McElroy in Human Resources also saw Seals wearing the bag on this date.

[11] While it is clear that Woods had supervisory authority over the Plaintiff, it is unclear whether Deramus was also his supervisor at this time.

his hospitalization.

### H.    McCormick Takes Over Supervising the Saws

Sometime after Seals was released to full duty, in late spring or summer of 2013, McCormick, the supervisor over the cleaning room, took supervisory authority over the saws in order to improve the efficiency of the manufacturing process and make sure that the jobs that were more urgent were prioritized. When Stan Hand became the plant manager[12], he kept McCormick with supervisory authority over the saws because he thought that would streamline the process of finishing the metal castings.

McCormick was viewed by those she supervised as a tough boss because she is a hard worker and expected the same work ethic from those she supervised. McCormick was strict with every employee she supervised. When McCormick was the supervisor of the cleaning room as well as over saws, she would walk back and forth between the Cleaning Room and the saws, which is a short distance across a small alley. Seals and the other saw operators chatted with each other during the day, which McCormick did not like. In the course of his job duties, Seals also spoke with the forklift operators, who were Derrick Murphy, Leslie Underwood, and Mike

---

[12] Employees of Lee Brass seem to have understood Hand to be the plant manager at this time, though his technical title was "foundry manager." The court will refer to him as the "plant manager."

Mason.

The Plaintiff contends that McCormick was not as friendly to African American employees as to Caucasian employees. (Doc. 28-3 at 47(182)). However, Seals testified that McCormick was friendly with the African American employees who she supervised in the Cleaning Room.[13] According to Seals, McCormick also was friendly with Lewis Butts, an African American forklift operator. Seals claims that McCormick did not like to chat with the saw operators, all of whom were African American, but she was more friendly with the employees in the Maintenance Department. Seals alleges that at the time he worked at Lee Brass, African American employees were somehow precluded from working in the Maintenance Department.

McCormick told all of the saw operators, including Seals, that they sometimes took bathroom breaks too frequently. All of the employees who worked on the saws were African American. Seals talked to Lamar Willingham, Stacey McClellan, and Lewis Butts about their feeling that McCormick was discriminating against them

---

[13] The Plaintiff testified as follows in his deposition:

If you was white, she conversate with you, speak to you, talk to you, smile with you, laugh with you, shake your hand. If you was black, she just didn't deal with you. If you didn't work -- if you was black and you worked in that cleaning room for her, that was different. But if you was black and you worked on the saws where she came over at, she didn't talk to you, didn't speak to you, didn't have no conversation at all for you.

(Doc. 28-3 at 48(187)).

because they were African American.

Seals claims that, after McCormick became his supervisor, she timed him when he went to the bathroom and would tell him he had been in the bathroom too long or had gone to the bathroom too frequently. McCormick told all the saw operators, all of whom were African American, that they needed to try and limit the number of bathroom breaks they took and try to make them as short as possible. Seals claims that McCormick watched all the saw operators closely and would make them re-cut parts if she felt a part was not cut properly; Seals does not know if she supervised the employees in the Cleaning Room as closely.

Wood and Deramus allowed the saw operators to end their shifts early so they had more time to shower, but McCormick made the saw operators work until the scheduled end of their shifts. Seals claims that McCormick treated the saw operators differently than Wood or Deramus had because, if they were late coming off a break, McComick would issue a write-up, where Deramus and Wood would not have. However, McCormick never wrote up Seals. McCormick required the saw operators to be at their saws five minutes before the horn signaling the start of work went off. Seals testified that McCormick treated all the saw operators the same way and the saw operators discussed her supervisory style amongst themselves.

## I.    The Plaintiff's Medical Condition and Belief That He Was Disabled

Seals never told anyone at Lee Brass he was "disabled." When asked in his deposition whether he had "a physical condition which makes you disabled," the Plaintiff testified "Not at this point now." (Doc. 28-3 at 83(325-326)). However, he testified that while he worked for the Defendant, "[t]he symptoms that [he] experienced going in the hospital, that made me disabled." (Doc. 28-3 at 83(326)). He also testified to "spitting up some black mucus," after he left the hospital. (Doc. 28-3 at 83(326)). Seals's disability claim is based on his contention that he was <u>regarded</u> by Lee Brass as being disabled.

## J.    McCormick Starts To Have the Plaintiff Operate a Big Saw

McCormick wanted Seals to move from working on a small saw to working on a big saw.[14] Some months after he was released from the hospital in April 2013, McCormick began to regularly move Seals from working on the small saws to working on the big saws. None of Seals's previous supervisors had ever had him

---

[14] In McCormick's deposition, the following exchange took place:

A.    I don't remember ever asking him to go to the big saw.

Q.    The whole time you supervised him, you understood and remember him being on the small saw?

A.    Yes, ma'am.

(Doc. 28 -4 at 48(187)).

work on a big saw. McCormick moved Seals from a small saw to a big saw because, of the saw operators who normally worked on a small saw, Seals had been employed with Lee Brass the longest and was the most experienced. On multiple occasions McCormick required Seals to use a big saw to cut larger parts that needed to be sawed, which he was able to do. He successfully operated a big saw and cut large parts using it over twenty times in a period of approximately three months. However, in his deposition, Seals testified that he "didn't know how to use [a big saw]." (Doc. 28-3 at 17(63)).

Once, on an unspecified date, when McCormick asked Seals to use a big saw, he told her that he could not lift the heavier parts onto the sawing table and protested that he had not been trained on a big saw. McCormick responded that his inability to lift was not a problem because he could use the crane next to the saw to lift heavy parts, to which Seals responded that the crane in question did not work. Seals testified that McCormick then told him that he needed to go operate a big saw "if he wants the job" so Seals complied and operated a big saw successfully that day. (Doc. 28-3 at 36(139)). Since the crane was not working, Seals got the larger parts onto the saw table by having a forklift operator lift them for him.

### K.     The Events Leading to the Plaintiff's Discharge

On August 21, 2013, Seals was operating a small saw cutting red brass. He had

already told McCormick, that day, that he was not feeling well. (Doc. 28-3 at 57(224)). McCormick asked Seals if he needed to go home and Seals said he was alright and was just feeling woozy but he could manage. McCormick told Seals to let her know if he needed to leave.

At some point thereafter, on that same day, McCormick told Seals that he needed to use a big saw to cut a job. McCormick wanted Seals to work on a big saw to cut a "hot job" of parts that were also made of red brass and which needed to ship out as soon as possible. A "hot job" is an order of parts that must ship from Lee Brass very soon to meet customer requirements. When hot jobs arise, everyone in the manufacturing process must strive to get the order ready on time.

In his deposition Seals stated:

> I could not do it. I mean, I told her that. And she was like, well, I don't see nothing on the doctor. I said, because I told the doctor, Ms. Judy, that -- the doctor asked me did I have a light duty job. I said, well, yes, what I do out there, the little parts, they are light. . . . So when she sent me to go over there, I told her, I said, Ms. Judy, I don't supposed to be lifting this heavy stuff. I say, you know, I was in the hospital back in April.

(Doc. 28-3 at 49(192)-50(193)). Although McCormick had assigned Seals to use a big saw more than twenty times, Seals testified that this was the first occasion where he told McCormick he could not operate a big saw due to his hospitalization in April.

The following exchange then took place in the Plaintiff's deposition:

A.    . . . [McCormick] left. She came back. Well, I don't see nothing in your file talking about you can't lift nothing heavy or nothing like this. I said, well, it's nothing that's going to be in my file, Ms. Judy, because I always worked on the small saw since I signed up to be a saw operator. You're going to work on the big one today. I said, no, no, I'm not. So -- yes, you are. She grabbed me by my arm.[15] I said, hey, don't do that. Don't touch me. So she left and went and got Stan Hand. He came back. I explained to him. We standing up there. I'm explaining to him, Stan, I can't lift this. Well, why don't you just quit. Just go on and quit. I said, I ain't no quitter, Mr. Stan Hand. I don't give up on nothing. Because he hadn't been there long being the plant manager. I don't know where he came from.

* * *

A.    . . . He's like, why don't you just quit, just give up and just quit. I said, no, I ain't going to quit. I got bills to pay, and I don't quit at nothing that I do, but I can't go over there and lift that – I'm not going to go over there and lift that heavy stuff. I'm not fixing to do that. Okay, just stay where you're at. They left, him and Judy left. Ms. Judy came back, told me to come to the office.

(Doc. 28-3 at 50(194-195). Despite his protestations regarding lifting, it is undisputed that, at this time, Seals was in good physical shape and was physically capable of weightlifting, which had been a hobby of his. However, Seals testified that he had not done any weightlifting since April of 2013. (Doc. 28-3 at 92(364)). Seals believes he could bench press between 425 and 475 pounds at that time. (Doc. 28-3 at 58(228)-59(229)).

The Plaintiff also testified that he told Hand that he had not been trained on a

---

[15] Seals testified that she grabbed his arm "pretty hard." (Doc. 28-3 at 54(211)).

big saw, and that Hand told him to stay on a small saw. (Doc. 28-3 at 57(221)). Hand

had been the Plant Manager for only a few weeks, was not working there when the

Plaintiff was hospitalized, and Seals had not spoken to him previously.[16] Seals did not

cut any parts on a big saw that day.

Afterwards, and at some point that same day, Seals began to cut green brass on

a small saw. Seals then had an interaction with Underwood, who was operating a

forklift. The Plaintiff testified:

> Ms. Judy went over there and told him something, and then he came
> over there on this forklift and brought me some things to cut. And I
> asked him, I said, put it on the floor. I said, I'll get to it. I ain't feeling too
> bright, man.

(Doc. 28-3 at 61(238)). The Plaintiff testified that the parts Underwood brought were

red brass. (Doc. 28-3 at 62(243)). Underwood then said: "You going to cut them,

motherfucker. You're going to cut them now. She want them cut. You going to cut

---

[16] In his deposition, the Plaintiff stated:

A.    . . . They knew I had a medical condition. They knew it. And they stated to
me that they knew it – well, not Stan Hand, because, like I say, when I got out of
the hospital, he just –

Q.    He didn't start working there until some months later?

A.    Yeah, some weeks later. It wasn't even a month. He came a few weeks
later. But Ms. Judy, she knew I had a bad medical problem.

(Doc. 28-3 at 86(338)).

them." (Doc. 28-3 at 61(239)). Seals responded: "[Y]ou can put them on the floor. I'll cut them when I'm finished, when I'm finished with this right here." (Doc. 28-3 at 61(239)). The Plaintiff also testified: "I said, I don't care what she said. I'm going finish this first, and then I'll get to that when I got time, if I have time." (Doc. 28-3 at 61(239)). Seals also admits that he swore back at Underwood. After that, McCormick left. (Doc. 28-3 at 64(249)).

McCormick testified that when Underwood attempted to change the pallet that Seals was working on, Seals became angry, and she spoke to the Plaintiff and told him that Underwood was only doing what she had told him to do. (Doc. 28-4 at 35(134)).[17] She states that at that time Seals threw a part that he had in his hand. (Doc. 28-4 at 35(135-136)). The Defendant alleges that this part was thrown at Underwood, but the Plaintiff disputes that he threw anything. (Doc. 28-3 at 65(253-254)).[18] When

_____

[17] She states

[Seals] got angry and started saying something to Leslie [Underwood]. I couldn't hear exactly what they were saying, but I could tell they was getting into a discussion, and I went over there and told Jerald that that was a hot job, and Leslie was only doing what I asked him to do.

(Doc. 28-4 at 35(134)).

[18] The following exchange took place in the Plaintiff's deposition:

Q.    Did you throw a part at all?

A.    Yes. When I was cutting, I'd throw the piece in the scrap bucket, and the scrap piece that I cut off of there and the part itself, throw it in a bucket. But the

Underwood was asked in his deposition if he knew why the Plaintiff had been terminated, he stated he "didn't see him do nothing." (Doc. 28-10 at 29(109-110)).[19] Murphy was present as well and did not see the Plaintiff throw anything, but also admits that he did not watch the entire altercation. (Doc. 33-3 at 18(66)).

According to Hand, both McCormick and Underwood then reported this incident to him. In Hand's deposition, the following exchange took place:

A.      [McCormick] told me that [Seals] had threw a part, and it bounced off the wooden pallet and almost hit Leslie [Underwood].

Q.      Okay. Where was -- what was he throwing the part at? I mean, what, was he throwing it at the bins or was he throwing it at something else?

A.      According to her, he was throwing it at Leslie.

Q.      Oh, okay.

* * *

Q.      Did she say she saw that?

_____

bucket is -- they just right beside you. So you're really just rolling them off in there so they won't bend. They're just right beside you, and the scrap bucket just right in the front. That ain't no throw. You're just pitching it over the thing.

(Doc. 28-3 at 65(254)).

[19] The Plaintiff argues that "Underwood testified that Seals did not throw anything at him." (Doc. 34 at 12) (citing doc. 28-10 at 29(108-110)). Nothing in the cited portions of Underwood's deposition supports this contention. However, it is undisputed that "Underwood never saw Seals throw a part at him or do anything to cause him to get fired." (Doc. 34 at 23, ¶50 (Plaintiff's proffered fact), no dispute by Defendant in document 35(reply brief)).

A.  Yes.

Q.  And what did Leslie Underwood tell you?

A.  Actually, Leslie was the first one that burst in my office and tell me that he had -- Jerald was cussing him and threw a part at him.

Q.  And what did he tell you?

A.  He told me that he was trying to set up this hot part that Judy needed to get out. And I think Derrick Murphy was helping Leslie at the time. And he stated to Derrick that he didn't want to do that part, and Derrick went and got Leslie. And when Leslie got over there on his forklift, he told him he was going to cut it. I don't know what exchange happened, and that's when he threw the part at him.

Q.  Did Leslie say that Mr. Seals threw a part at him?

A.  That's what he told me.

(Doc. 28-8 at 17(62-64)).

After this incident, and about 10 or 15 minutes after Hand had told the Plaintiff to stay on a small saw, McCormick told Seals, again, to work on a big saw cutting the same hot job as before. (Doc. 28-3 at 57(223)). Again, it is undisputed that Seals did not cut anything on a big saw that day.

The Plaintiff states that after he finished the job on the small saw (which he continued to do the entire time), McCormick told him to go to the office. (Doc. 28-3 at 64(251)). The Plaintiff testified that Hand was present when they arrived in the office, and

they told me Jerome [Truss] said send me home for the day. I said, for what? She said, because you refused to work. I said, I didn't refuse to work, and you know I didn't refuse to work. And I said, Stan, you just got here. You don't even know me like that.

(Doc. 28-3 at 64(250)). Elsewhere in his deposition, the Plaintiff testified:

This time I roll up in the office with Stan Hand, walked in and sat down. Stan said, man, what's the problem, man? You don't want to do the job, man? I said, I was doing the job where you left me on the small saw. Yeah, yeah, yeah, I did leave you on the small saw, but, you know, I'm going to roll with my supervisor right here. Jerome said send you on home for the rest of the day.

(Doc. 28-3 at 60(234)).[20] Hand does not remember asking Seals in their meeting whether he threw the part, and there is no documentation regarding his questioning of the Plaintiff about this incident. It is undisputed that Hand did not personally witness any of the events of the incident between Seals and Underwood. The Plaintiff testified that Hand decided "to send me home for the rest of the week, not the day, the rest of the week. Because it was a week before I seen him again." (Doc. 28-3 at 60(234)).

---

[20] On another occasion, the Plaintiff testified:

He was on the phone. He turned around, he asked me what's the problem. I said, it ain't no problem with me. He was like, well, what's the problem with the big -- with the hot job that's on the red brass, the hot job? I said, Stan, I can't lift that stuff, man. I said, man, I told her I ain't feeling too good. I cannot lift that stuff. Well, I talked to Jerome. Jerome told us to go on and send you home for the rest of the day.

(Doc. 28-3 at 61(237)).

Hand testified in his deposition that when he sent the Plaintiff home it was a suspension given to Seals "[b]ecause he threw a part at another employee." (Doc. 28-8 at 18(67)). Until he was suspended, the Plaintiff was never warned, disciplined, or given "progressive discipline" for anything. There is no record of any discipline in his file before he was suspended and ultimately terminated.[21]

On August 28, 2013, the Plaintiff's suspension became a termination. Hand testified that the Plaintiff was fired for throwing the part at Underwood. (Doc. 28-8 at 18(67)). Not until Seals applied for unemployment compensation was he informed that he had been terminated for throwing a part at Underwood.[22] The Plaintiff testified that he went to Lee Brass and spoke to Truss, who offered him a third shift position, and then fired him. (Doc. 28-3 at 67(263-264)). Hand did not look to see if Seals had any prior discipline before terminating him.

McCormick testified that, despite the fact that she was his supervisor, she did not participate in the decision to fire Seals. (Doc. 28-4 at 43(166)). However, the following exchange took place in Hand's deposition:

Q.    Who made the decision to fire Jerald Seals?

A.    I made the decision to suspend Jerald with investigation.

---

[21] In fact, in 2012, Seals was given a performance evaluation for a "step increase" in pay, and was given the highest possible ratings.

[22] As will be discussed, Hand and Truss do not agree on why the Plaintiff was terminated.

Q.     So you made the decision to suspend him?

A.     Yes, ma'am.

Q.     Did anybody have any input in that?

A.     Judy McCormick and myself.

Q.     Anybody else that made the decision to suspend him other than you and Judy McCormick?

A.     No, ma'am.

Q.     Who made the decision to terminate Mr. Seals or fire him?

A.     Jerome Truss and myself.

Q.     Did Judy have input in that?

A.     No.

Q.     Well, she was his supervisor, right?

A.     Yes.

Q.     And normally the supervisor would have input in that.

* * *

A.     She had input up to the suspension, but ultimately it was my decision.

Q.     Did she have any input?

* * *

Q.     I know you say that ultimately it was your decision. But she had

input as his supervisor, though, right?

* * *

A.     Yes, ma'am.

Q.     Of course, she did.

* * *

Q.     Because it was the supervisor's job to discipline an employee if they saw a problem, right?

A.     Yes, ma'am.

Q.     That's what you expected.

A.     Yes, ma'am.

Q.     Because you can't watch all the employees. That's why you have the supervisors.

A.     Yes, ma'am.

Q.     They're there to manage that department and discipline the employees if there's an issue, right?

A.     Yes.

Q.     So if Mr. Seals had done anything, you know, if Judy McCormick had had any issues with him prior to him being suspended and his termination, she should have disciplined him, right?

* * *

A.     Yes.

(Doc. 28-8 at 16(57-59)).

Truss testified that Seals was terminated for refusing to perform a job. (Doc. 28-12 at 20(75)). Between the time Seals was suspended by Hand and the time his employment was terminated, Truss states that he performed an investigation of Seals['s] conduct toward Underwood. Truss testified that he spoke with McCormick, Hand, Underwood, and Derrick Murphy. (Doc. 28-12 at 16(58)). In his deposition, Underwood testified that no one from Lee Brass ever got a statement from him regarding this incident. (Doc. 28-10 at 29(110)).[23] Although Hand "assumes" that this incident was investigated between the time Seals was suspended and his termination, he states that he was not involved. (Doc. 28-8 at 18(68)). Furthermore, Truss did not mention <u>Seals</u> as a person he interviewed. He admits, however, that Seals denied doing anything wrong. (Doc. 28-12 at 28(108)).

Truss does not recall anything that he did to investigate. Truss knows of no documentation regarding his investigation. (Doc. 28-12 at 17(64)). Although there is documentation concerning the events which led to Seals's termination, they were all created <u>after</u> Seals was terminated. (Doc. 28-12 at 18(65)).

Despite the fact that Truss contends that Seals was fired for refusing to perform

---

[23] The Defendant argues that Underwood was testifying about whether he was asked for a statement the day Seals was suspended. (Doc. 35 at 12, ¶87). The Court has reviewed the testimony cited and sees no such limiting language in this statement.

a job, Truss testified that past threatening and behavior issues factored into the Plaintiff's termination. Indeed, the termination letter which Hand prepared (and the Plaintiff refused to sign) states:

> Your behavior on this day of telling people what you were not going to do, slinging pieces of metal, and becoming irritated due to being asked to perform your job cannot and will not be tolerated in the work place. [] [S]imilar types of these behaviors have been demonstrated by you in the [past]. We informed you the last time this occurred that this type of behavior will not be tolerated.

(Doc. 33-4 at 1).[24] Truss admitted that, consistent with the company's progressive discipline policy, supervisors are supposed to document discipline given to an employee. (Doc. 28-12 at 24(89)). There was no documentation in the file that the Plaintiff ever refused work, or was counseled regarding "threatening" behavior, prior to this incident.[25] Truss explained that Lee Brass did not follow the progressive

---

[24] Seals wrote on the letter that he did not refuse to work and that he had been disrespected by another employee.

[25] The following exchange took place in Truss's deposition:

Q.    Was he fired in any way for any issues that Kenny Deramus had with him?

A.    Was he -- repeat that.

Q.    You told me that Kenny Deramus had issues with him. Did those issues factor into Mr. Seals' suspension or termination?

A.    Yes.

Q.    Okay. What?

A.      Well, one of the conversations we had with him is that if he -- any type of a threatening or behavior issues, that we were going to terminate him.

Q.      Where in his personnel file does it indicate you ever told him that?

A.      We don't have it.

Q.      It doesn't.

A.      No.

Q.      And if you tell an employee one more incident of threatening behavior and you're fired, that should be documented, shouldn't it?

A.      It's not documented. Yeah.

Q.      It should be, though, shouldn't it?

A.      Yes.

Q.      And threatening behavior is a serious offense, right?

A.      Yes.

Q.      So there should be some write-up somewhere about him allegedly threatening some employee before his termination, right?

* * *

A.      Yes.

Q.      And that doesn't exist?

A.      No, we do not have any in writing.

Q.      And there's nothing to say that he had ever been previously warned in writing or verbally before his suspension and termination, correct?

* * *

A.      No.

discipline policy when they terminated Seals because this incident was serious enough that they could move directly to termination. (Doc. 28-12 at 27(104)).

It is undisputed that neither Hand nor McCormick ever used racial terms or racially derogatory terms towards Seals. However, the Plaintiff testified as follows regarding Hand:

> [H]e always -- when you try to speak to him, well, he didn't conversate with blacks. If you spoke to him, he looked at you crazy and kept going. But white, he'll stand in the corner and talk to you all day long. But a black man, no, Stan ain't fixing to sit there and talk to you. If it ain't about that job, no, he ain't fixing to talk to you.

(Doc. 28-3 at 50(196)).

---

Q.    Why not?

A.    It's not.

Q.    Why not?

A.    Just don't have it.

Q.    This man lost his job. Why isn't there something in his personnel file that reflect any of these alleged issues you're telling me about?

A.    There's not.

Q.    Does that concern you?

A.    Always.

Q.    Sure. Because there should be some documentation, right?

A.    Documentation is always good.

(Doc. 28-12 at 25(93-95)).

## L.    Hand's Knowledge About any Alleged Disability

Hand was not aware that Seals had been in the hospital. Hand was not working at Lee Brass at the time Seals was hospitalized. Hand never heard anything about Seals spitting up blood nor did he hear anything about Seals wearing a heart monitor because, among other reasons, Hand did not work at Lee Brass until months later in July 2013.

## M.    Seals's Alleged Disability

When asked in his deposition if he considered himself disabled, the Plaintiff testified "No, not to work. As far as to work heavy jobs like Lee Brass, yes. But like the job I'm doing now, no." (Doc. 28-3 at 82(323)). When asked again to explain the sense in which he was disabled, he stated:

> To work jobs like Lee Brass, yes, lifting heavy materials, parts, being in that heat like that, three thousand degree heat, being in steel-toed boots all day, having to stand up on the concrete floor all day. As far as, you know, the work itself, you know, lifting, bending, heavy parts, machine breakdown, going up under a tunnel and digging the dirt from around the belt because too much dirt around it under the ground won't make it move because it's just too packed down there to move.

(Doc. 28-3 at 82(324)). Later he stated: "The disability part of the job to me is that it's unsafe. It's unsafe, and it wears and tears your body." (Doc. 28-3 at 83(325)). He also stated:

> The job, as far as doing the job, it wasn't the problem. It was the way

36

they carried me after they seen me come out of the hospital, how they started treating me, discrimination against me, and wanting me to get on something that you got to have training for that I have no idea to work on.

(Doc. 28-3 at 86(337-338)).

N.    **Seals's EEOC Charge**

After Seals was fired, he filed an EEOC charge. Truss testified that he investigated Seals' EEOC charge. The only witness statements that were taken by Truss were taken after Seals filed his EEOC charge.

One of those statements is from McCormick, and it reads: "He started slinging the parts so hard that they were bouncing out of the pan and into the floor." (Doc. 33-5 at 2). In her deposition, McCormick testified her statement was not true and, during her deposition, she wrote on her statement "not true, I saw throwing 1 part and bouncing off pallet." (Doc. 28-4 at 53(205)-55(214); doc. 28-5 at 9).

On September 9, 2013, Pat McElroy, in Human Resources, sent the Alabama Department of Industrial Relations information relating to Seals's termination, stating Seals was terminated for "insubordination." (Doc. 33-10 at 2). Seals was awarded unemployment compensation benefits. (Doc. 33-11 at 2).

On October 15, 2013, Truss responded on behalf of Lee Brass to Seals's EEOC charge. (Doc. 33-7 at 2). On page two of Defendant's EEOC response it states, "On

numerous occasions Mr. Seals would wander from his work station and his supervisor would have to find him and instruct him to stay on his job…" (Doc. 33-7 at 3). In his deposition, Truss testified McCormick told him Seals would wander off, but he had no idea when this occurred, no documentation of this allegation, and admitted Seals did not receive any discipline or counseling for this allegation. Truss testified this alleged "wandering" did not factor into the decision to terminate Seals, yet he included it in the company's response to the EEOC.

Truss's response also states: "Mr. Seals, not Mr. Underwood, cursed and acted irrationally." (Doc. 33-7 at 3). In his deposition, Truss could not recall whether he ever asked Underwood if he cursed at Seals. (Doc. 28-12 at 45(175)). He could not recall where he got that information. (Doc. 28-12 at 45(176)-46(177)).

Lee Brass' response to the EEOC contains the allegation that Derrick Murphy and Underwood "advised that Mr. Seals began to act irrationally, cursing them, and refused to perform the work that was requested." (Doc. 33-7 at 3). The following exchange took place in Murphy's deposition:

Q.     Has anybody at Lee Brass ever asked you about any issue between Jerald Seals and Leslie Underwood?

A.     No, ain't nobody ever asked me nothing about it.

(Doc. 33-3 at 11(40)).[26] Furthermore, in his deposition, Murphy stated that he did not know what was said during the alteration with Underwood (doc. 33-3 at 18(65-66)), and he did not witness Seals throw any parts (doc. 33-3 at 18(66-68)). In his deposition, Truss could not recall whether Murphy told him before Seals was suspended that he did not hear him use profanity and did not see him sling any parts. (Doc. 28-12 at 50(194)). Regarding what Murphy told him after the suspension, Truss testified that "[h]e told me they had a confrontation." (Doc. 28-12 at 509194)).

Lee Brass' EEOC response also alleges Seals, "began throwing scrap pieces throughout the shop area." (Doc. 33-7 at 3). There is no evidence in this Court's record to substantiate this statement.

O.    **The Failure To Train Employees**

McCormick has been a supervisor for fifteen years and has never been given training on discrimination or retaliation policies or compliance. McCormick has never been trained on any ADA policy or compliance and could not state one thing about Lee Brass's disability policy.

Pat McElroy who works in the Human Resources department has never

---

[26] The Defendant argues that this statement was made in the context of an on site investigation by the EEOC. (Doc. 35 at 13, ¶90). While that had been the line of questioning immediately prior, neither the question asked, nor the answer thereto, was limited to that time frame. A reasonable jury could conclude that the issues were never discussed with Murphy.

received training on the ADA. Stan Hand, the plant manager at Lee Brass, has received no training on discrimination from the company. Truss testified that Lee Brass did training related to discrimination prior to 2014-2015, but that the training was not mandatory.

## III.    ANALYSIS

### A.    The ADA Claim in Count One

Under the ADA, it is unlawful for an employer to discriminate on the basis of disability in regards to the "terms, conditions, and privileges of employment," including "discharge of employees." 42 U.S.C. § 12112(a). "Employees may claim unlawful discrimination under the ADA by showing either that the employer's facially neutral conduct had a disparate impact on members of a protected class (disparate impact) or that the employer treated certain employees worse than others because they possessed a protected trait (disparate treatment)." *Norris v. GKN Westland Aerospace, Inc.*, 921 F. Supp. 2d 1308, 1313 (M.D. Ala. 2013) (Thomson, J.) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52–53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003)).

As noted at the beginning of this opinion, the Complaint alleges that the Defendant "harassed [the] Plaintiff, treated [the] Plaintiff differently[,] and terminated [the] Plaintiff," in violation of the ADA. (Doc. 1 at 6). However, in the Plaintiff's

brief he alleges disparate treatment only in that he was <u>terminated</u> based on being regarded as disabled (doc. 34 at 33, 35), and no argument regarding light work, or any other type of disparate treatment, is made by the Plaintiff. For this reason, the Court will omit any discussion of the Defendant's (one paragraph) argument that "Seals was not treated different [sic] after he went to the hospital because he was perceived as disabled." (Doc. 27 at 31). However, in light of the fact that the issue was raised by the Defendant, the Court will deem all ADA claims based on anything other than the Plaintiff's termination to be abandoned, and summary granted will be granted to the Defendant thereon. *See, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's

complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").[27]

The Eleventh Circuit has noted:

> We analyze ADA discrimination claims under the *McDonnell Douglas* burden-shifting analysis applied to Title VII employment discrimination claims. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.2000). Under that framework, a plaintiff-employee first establishes a prima facie case of discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir.2004). To establish a prima facie case of ADA discrimination, a plaintiff must show (1) a disability, (2) that she was otherwise qualified to perform the job, and (3) that she was discriminated against based upon the disability. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir.2004). The burden then shifts to the defendant to articulate a legitimate reason for its employment action. *Wilson*, 376 F.3d at 1087. If it can, the burden shifts back to the plaintiff to offer evidence that the reason is pretextual. *Id.* If the plaintiff fails to show pretext, we affirm the grant of summary judgment on that ground. *EEOC v. Total Sys. Servs.*, 221 F.3d 1171, 1177 (11th Cir.2000). Where the defendant has met its burden of articulating a legitimate, non-discriminatory reason for its action, we may assume without deciding that the plaintiff has established a prima facie case and decide the case on the question of pretext. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (1997); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir.2001).

---

[27] Too, the court is under no independent obligation to develop grounds in opposition to summary judgment on behalf of the Plaintiff as "the onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted); *see also id.* ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)).

*Thomas v. Dolgencorp, LLC*, 645 F. App'x 948, 950–51 (11th Cir. 2016).[28] The

Defendant argues that the Plaintiff cannot make out a prima facie case of

discrimination, and that, even if he could, he cannot show that Lee Brass's legitimate

non-discriminatory reason for his termination was a mere pretext for discrimination.

### 1.    *Prima Facie Case*

The Defendant argues that the Plaintiff was not suffering from a "disability"

as that term is defined by the ADA. The ADA provides:

The term "disability" means, with respect to an individual–

> (A) a physical or mental impairment that substantially limits one
> or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment[.]

42 U.S.C.A. § 12102(1). The Plaintiff argues only that the Defendant regarded him

as having an impairment. (Doc. 34 at 32-34) One is "regarded as having such an

impairment"

> if the individual establishes that he or she has been subjected to an
> action prohibited under this chapter because of an actual or perceived
> physical or mental impairment whether or not the impairment limits or
> is perceived to limit a major life activity.

---

[28] The *McDonnell Douglas* analysis applies to claims, such as the instant claim, which are
based on <u>circumstantial</u> evidence.

42 U.S.C. §12102(3)(A). However, the impairment cannot be "transitory [or] minor.

A transitory impairment is an impairment with an actual or expected duration of 6

months or less." 42 U.S.C. §12102(1)(B).

The Defendant begins its argument by setting out the incorrect law on this issue

when it states:

> To make out a prima facie case under the ADA's "regarded as" prong, the plaintiff must prove that the individuals who made the challenged decisions regarded him "as having a **permanent** or **long-term impairment**" that "**substantially** limited a **major life activity**." *See e.g.*, *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) (emphasis added); *Sutton v. Ladder*, 185 F.3d 1203, 1209 (11th Cir. 1999); *See also* 42 U.S.C. § 12102(2).

(Doc. 27 at 30) (emphasis in original). As this Court noted earlier this year:

> The *Cash* opinion . . .predates the ADAAA, which significantly transformed the regarded-as definition and made it much easier for a plaintiff to prima facially fit into this third disability category because proof that an employer perceives the plaintiff to be limited in a major life activity is no longer required[.]

*Ward v. City of Gadsden*, No. 4:15-CV-0865-VEH, 2017 WL 568556, at *7 (N.D.

Ala. Feb. 13, 2017) (Hopkins, J.). Similarly, *Sutton v. Lader*, 185 F.3d 1203, 1208

(11th Cir. 1999), which held that "in order for a plaintiff to prevail on a perception

theory of disability discrimination, he must be able to show that, as with a real

impairment, the perceived impairment is 'substantially limiting' and significant," is

also unavailing to the Defendant.[29] The Defendant provides <u>no</u> analysis as to whether Seals has met the regarded-as prong as redefined by the ADAAA. *See Ward*, 2017 WL 568556, at *8 (denying summary judgment because "[t]he City provides no analysis of whether Mr. Ward has met the regarded-as prong as redefined by the ADAAA and nakedly and incorrectly asserts that Mr. Ward's prima facie case fails because he has not shown 'that he has been 'regarded' as having ... an impairment' limiting a major life activity."). For this reason alone, summary judgment on this issue will be denied.

Still, the Court deems it important to address the only argument made by the Defendant on the "regarded-as" claim–that "no supervisory level employee, nor anyone, at Lee Brass believed at any time that Seals was disabled." (Doc. 27 at 30). Lee Brass contends that McCormick, the Plaintiff's supervisor, "never saw Seals throw up blood at any time nor heard from any other source that he had done so. Nor

---

[29] The Defendant "doubles down" on this argument in its reply brief when it states:

what Seals fails to realize, is that in order to make out a prima facie case under the ADA's "regarded as" prong, the plaintiff must prove that the individuals who made the challenged decisions regarded him "as having a ***permanent or long-term impairment***" that "***substantially*** limited a ***major life activity***." *See e.g., Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) (emphasis added).

(Doc. 35 at 15) (bold and italics in original).

was McCormick ever aware that Seals had been in the hospital or was wearing a []<sup>30</sup> monitor." (Doc. 27 at 30) (citations omitted). This is incorrect when the facts are viewed, as they must be, in the light most favorable to Seals. As noted previously, when viewed in that light, a reasonable jury could find that McCormick knew about the Plaintiff vomiting blood first because she was told by Murphy, and second, because she was also either physically present when it occurred or at least saw blood on towels the Plaintiff was using at the time. Similarly, a jury could find, based on the Plaintiff's testimony, that Seals told McCormick that he had been hospitalized, and showed and explained to her about the monitor he was wearing, which she noted "was serious." Based on these facts, a reasonable jury could determine that at least one "supervisory level employee," McCormick, knew of the Plaintiff's hospitalization and condition.[31]

The Court also observes that the "regarded as" prong does not apply where the

---

[30] The Defendant had written the word "heart" which the Court has removed from this quote. The facts indicate that the Plaintiff was wearing a monitor, but not for his heart.

[31] There is no evidence to suggest that, at any time, Hand knew anything about the Plaintiff's hospitalization. However, the Plaintiff was fired by Hand and Truss after the Plaintiff told Hand he could not lift the heavy parts on a big saw. Regardless, the Defendant's underdeveloped argument does not explain why McCormick's knowledge, alone, was not sufficient. Furthermore, the Court will not address the arguments in the Defendant's reply brief which discuss Hand's and Truss's knowledge. (Doc. 35 at 17). The Defendant moved for summary judgment on this issue based <u>only</u> on the fact that no <u>supervisory</u> employee knew abut the Plaintiff's condition. Even though the Defendant is responding to the Plaintiff's argument, the underdeveloped nature of the Defendant's initial brief on this issue makes this discussion unnecessary.

impairment is "transitory [or] minor," and states that "[a] transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. §12102(1)(B). The evidence seems to indicate that the events which led to the Plaintiff's hospitalization never occurred again. Indeed, the Plaintiff was feeling well at the time he was fired, and agreed that he was physically able to lift large amounts of weight. It seems that his condition may qualify as "transitory." However, because the Defendant did not move for summary judgment on that basis[32], the Court does not deem the issue to have been properly raised so that the Plaintiff could have a fair

---

[32] In its reply brief, the Defendant writes:

> As to the allegations regarding McCormick, Seals' own testimony makes clear that he was not regarded by her as having a *long-term* impairment. He claims that once she became his supervisor – approximately a month after his hospitalization in April 2013 – McCormick required him to use the big saw, which he did approximately twenty times. That he was able to operate the big saw, and did so over a period of approximately four months until his discharge, makes clear that McCormick had no reason to consider him as having a long-term impairment, or in fact any impairment at all, as he was able to perform his job.

> Moreover, Seals also testified that when operating the big saw, the large parts are lifted onto the saw either using a winch or by the forklift. There is no heavy lifting involved. As such, even Seals' physical restrictions as alleged by him (which are not credible given that he could operate the big saw) would not give anyone the impression he was disabled.

(Doc. 35 at 16). These arguments, which were raised for the first time in the Defendant's reply brief, will not be considered. *See, Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.").

opportunity to respond. Accordingly, the Court makes no judgment at this time as to whether the Plaintiff's condition is "transitory."

Finally, the Court must speak to the "comparator" issue. The Eleventh Circuit has stated:

> To establish unlawful disparate treatment, a plaintiff generally must demonstrate that his employer treated similarly situated employees outside of his protected class more favorably than he was treated. *See Burke–Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir.2006). When the plaintiff alleges . . . that other employees engaged in similar []conduct [as he] but were not similarly disciplined, the plaintiff must produce evidence that "the quantity and quality of the comparator's []conduct [was] nearly identical." *McCann v. Tillman,* 526 F.3d 1370, 1373 (11th Cir.2008) (quotation marks omitted).

*Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) (ADA). Again, only in its reply brief, does the Defendant argue that the Plaintiff cannot point to any relevant comparators. (Doc. 35 at 17). This argument comes too late. Regardless, the Eleventh Circuit has also noted that

> a plaintiff will survive summary judgment even without comparator evidence as long as he presents some other circumstantial evidence that raises a question of fact as to the employer's discriminatory intent. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[E]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.").

*Banks v. iGov Techs., Inc.*, 661 F. App'x 638, 644 (11th Cir. 2016). In this case, and

as shown in the next section of this opinion, there is circumstantial evidence of

discriminatory intent.[33]

**2.      *The Defendant's Legitimate Non-Discriminatory Reason for Termination and the Plaintiff's Showing of Pretext***

Because in the instant case these two discussions overlap, the Court will

address them together. Since the Plaintiff has survived summary judgment on whether

or not he can make out a prima facie case, the burden shifts to the Defendant

> to produce evidence that its action was taken for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. However, the defendant's response must frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question.

*Voudy v. Sheriff of Broward Cty. Florida*, No. 16-12059, 2017 WL 2983892, at *4

(11th Cir. July 13, 2017) (unpublished) (internal quotations and citations omitted).

If the Defendant successfully articulates such a reason, or reasons,

> "[t]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir.1993) (citation omitted). A reason is not pretext for discrimination "unless it is shown both that the reason was

---

[33] There is merit in the Plaintiff's argument that it is impossible to identify a comparator when the Defendant's reasons for the Plaintiff's termination keep changing.

false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

*Brooks v. Cty. Comm'n of Jefferson Cty.*, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006).

To show pretext, the Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotations and citations omitted).

In the instant case, summary judgment is due to be denied either because the Defendant cannot get its legitimate non-discriminatory reason straight, or because the reason or reasons it gives are unworthy of credence.[34] In its brief, the Defendant states that "Lee Brass terminated Plaintiff's employment because Stan Hand and Judy McCormick believed he threw a metal part at Leslie Underwood." (Doc. 27 at 31-32; *see also*, doc. 27 at 29 ("Seals is unable to rebut Lee Brass'[s] nondiscriminatory

---

[34] The Court notes that the Defendant's underdeveloped argument on this point states only:

> Even if Plaintiff could make out a prime facie case, which he cannot, he cannot rebut Lee Brass' non-discriminatory reason for terminating his employment. Specifically, and whether or not Plaintiff did indeed do it, Lee Brass terminated Plaintiff's employment because Stan Hand and Judy McCormick believed he threw a metal part at Leslie Underwood.

(Doc. 27 at 31-32).

reason for his termination – namely, that employees are not allowed to throw metal parts at other employees."); doc. 27 at 33 ("[I]t is clear that Lee Brass terminated Seals'[s] employment because it believed he had thrown a part at another employee.")). There are a number of problems with this explanation.

First, it is inconsistent with the Defendant's <u>own arguments</u> in its brief. The Defendant argues in its brief that McCormick had no involvement in the decision to fire Seals, and has no authority to fire employees. (Doc. 27 at 23, ¶126; doc. 27 at 25, ¶136). Furthermore, Hand testified that he <u>and Truss</u>, not McCormick, made the decision to fire Seals. (Doc. 28-8 at 16(57-59)).

Second, the Defendant has offered several different and inconsistent reasons why Seals was fired. Hand and Truss cannot agree on why the Plaintiff was fired. Hand says it was because Seals threw a part at Underwood (Doc. 28-8 at 18(67)), and Truss says it was for refusing to perform a job (doc. 28-12 at 20(75)).[35] For some reason, Truss told the EEOC that the Plaintiff would wander off from his assigned work station. (Doc. 33-7 at 2). McCormick admitted in her deposition that the statement she wrote for the EEOC was "not true," at least in part. McElroy told the Alabama Department of Industrial Relations that Seals was terminated for

---

[35] This disagreement may explain why the Defendant's proffered reason only refers to Hand and McCormick, and not Truss.

"insubordination." (Doc. 33-10 at 2). Finally, the Defendant contradicts its own position when, in its reply brief, it states:

> Seals was terminated <u>for two interrelated reasons</u>. One, Lee Brass terminated Plaintiff's employment because Stan Hand, based on a report made by Underwood directly to him, believed Seals threw a metal part at or dangerously near Underwood. Two, Seals was terminated because, as Seals admitted in his deposition, he blatantly refused to follow his supervisor's instructions.

(Doc. 35 at 18-19) (emphasis added) (citations omitted). These inconsistent, changing explanations are enough to establish pretext. *See, Faircloth v. Herkel Investments Inc.*, 514 F. App'x 848, 851 (11th Cir. 2013) ("[T]he identification of inconsistencies in an employer's testimony can be evidence of pretext."); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) (on review of grant of renewed motion for judgment as a matter of law after jury verdict, shifting reasons for termination allowed the fact finder to find the proffered reason unworthy of credence).

Furthermore, it is undisputed that the Defendant failed to follow the progressive discipline policy when it terminated the Plaintiff, and "[a]n employer's deviation from its established policies may be evidence of pretext." *King v. Sec'y, US Dep't of the Army*, 652 F. App'x 845, 847 (11th Cir. 2016) (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006)). Even

assuming, as Truss stated in his deposition, that this incident (whether it be refusal to work, throwing a part, or some other combinations of reasons) was serious enough to warrant termination without going through the intermediate steps of the policy[36], the handbook is clear that

> [b]efore administering discipline, the manager should be sure they have all the facts. The associate's past record should be examined in the Human Resources office to determine if the associate has had any previous violations. Associates should be given ample opportunity to present their side before any final decision is made as to the discipline to be administered.

(Doc. 28-2 at 60). No one examined the Plaintiff's past record, which was spotless, before suspending and terminating him. Furthermore, assuming the termination was for throwing the part, no one spoke to the Plaintiff and asked him if he did so, which is also required by the policy. Finally, although Truss claims that he conducted an investigation into the circumstances surrounding the Plaintiff's termination, a reasonable jury could conclude that he conducted <u>no</u> investigation, in light of the fact

---

[36] This is another argument which was not made by the Defendant in its initial brief. In its <u>reply</u> brief, the Defendant wrote only:

> Plaintiff also contends that Defendant's reasons were pretext because Lee Brass' progressive discipline policy was not followed because Seals had received no discipline prior to his discharge. The policy however, clearly states, the appropriate step of disciple is based on the seriousness of the offense. (QUOTE POLICY) [sic].

(Doc. 35 at 20).

that he had no documentation evidencing any investigation and could remember none of it, and at least two of the individuals he claimed to have spoken to (Hand and Underwood) state that they were not part of any investigation.

In light of these facts, the Court concludes that either the Defendant has failed to offer a clear legitimate non-discriminatory reason, or that the reasons which it gave are inconsistent and otherwise implausible, thereby establishing that, for summary judgment purposes at least, they are a mere pretext for discrimination. Summary judgment will be denied on the issue of whether the Plaintiff was terminated in violation of the ADA.

### B.    The Race Discrimination Claim in Count Two

The Plaintiff claims that he was fired based of his race, African American, in violation of 42 U.S.C. § 1981. The Defendant does not move for summary judgment on this issue, arguing instead that "Seals [argues] that he was not allowed to return to work on medical restrictions where Caucasian employees allegedly were allowed to do so." (Doc. 27 at 32) (citing doc. 1 at 8-9, ¶¶47-57). While that is part of his claim, the Plaintiff also alleges that he was "terminated because of his race, African American." (Doc. 1 at 9, ¶57). As the Eleventh Circuit has noted:

> A party seeking summary judgment must "identify[ ] each claim ... on which summary judgment is sought." FED.R.CIV.P. 56(a); *Gentry v. Harborage Cottages–Stuart, LLLP*, 654 F.3d 1247, 1261 (11th

Cir.2011) (same); cf. FED.R.CIV.P. 7(b)(1)(B) (stating that a motion requesting relief must "state with particularity the grounds for seeking the order"). A district court commits reversible error when it enters judgment on claims not identified in the motion for summary judgment and without advance notice. *Gentry*, 654 F.3d at 1261.

*Mosley v. Alabama Unified Judicial Sys., Admin. Office of Courts*, 562 F. App'x 862, 864 (11th Cir. 2014). Since the Defendant does not move for summary judgment as to the termination claim, that claim will survive.[37]

The Defendant does move for summary judgment on the Plaintiff's claim that white employees were allowed to have "light duty" assignments, but he was not. The Plaintiff makes no argument in response.[38]  Accordingly, the Court deems this claim to be abandoned.

## IV.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED, ADJUDGED**, and **DECREED** as follows:

1.    The Defendant's motion for summary judgment is **DENIED** as to the ADA discrimination claim in Count One, to the extent that claim is based on the Plaintiff's termination. Otherwise, the motion for summary

---

[37] Again, only in its reply brief does the Defendant address this issue. (Doc. 35 at 20-21). That argument will not be considered by the Court.

[38] The Plaintiff addressed only the termination aspect of this claim.

judgment is **GRANTED** as to Count One, and Count One is **DISMISSED with prejudice**.

2.    The Defendant's motion for summary judgment is **GRANTED** to the extent that it is based on any claim that the Plaintiff was discriminated against, based on his race, by being denied "light duty" assignments. Count Two, to the extent that it is based on that claim, is hereby **DISMISSED with prejudice**. In all other respects, the motion for summary judgment is **DENIED** as to the race discrimination claim in Count Two.

3.    This case will be set for a trial in a future order.

**DONE** and **ORDERED** this 27th day of September, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge